In the Matter of the Estate of JOSEPH P. HALE, Deceased.

[No. 13,439; decided March 22, 1906.]

Community Property.—The Declaration of a Testator in His Will that the property devised is his separate estate cannot be considered as evidence that it is such.

Community Property—Products of Foreign Real Estate.—Where a married man picks orchilla in Mexico from land owned by himself and his copartners and ships the product to market in England, and the returns are remitted to him at a point over one thousand miles from the place of production, these products together with real estate purchased with their proceeds in California are community property.

Community Property—Profits of Foreign Land.—The rule that property purchased with the rents and profits of land which is the separate estate of the husband becomes likewise his separate property is restricted to cases where the purchase money is the proceeds of land used in the ordinary manner, and does not extend to cases where the products are shipped to a distant country and used in a business venture.

Community Property—Conflict of Laws.—The rents and profits of Mexican land held by a resident of California are subject to the laws of Mexico, and by those laws they are community property.

Real Estate—Conflict of Laws.—Real estate in Lower California is subject to the Mexican law, even if it belongs to foreigners.

Community Property—Conflict of Laws.—Lands Purchased in a community property state with funds derived from real property acquired in a common-law state become the separate property of the husband, even if the funds were acquired in the other state under circumstances which would have made the land from which it was derived community property.

Community Property.—Money Borrowed by a Married Man and not secured by his separate property is community property.

Wills—Intention of Testator.—It Makes no Difference What Language is Used in a will, if the testator's intention can be determined it will be sacredly enforced.

Wills.—The Intention of a Testator must be Ascertained from the words of the will itself; it is not what the testator meant, but what his words mean. The intention to be sought is not what may have existed in his mind, but what is expressed in the language of the instrument itself.

Wills.—The Word ''Leave'' in a Will, as applied to the subject matter, prima facie means a disposition by will.

Wills—Injustice of this Disposition.—The intention of a testator, if lawful, must be given effect, however unjust it may appear to the court.

Wills.—A ''Limitation'' is Particularly Defined to be a qualification of an estate given; ''words of limitation are words which mark out the estate to be taken by the grantee.''

Wills—Cutting Down Fee.—Words of Command Addressed by a Testator to devisees are as ineffectual to reduce a fee to an estate for life as precatory or explanatory words; such words are not enough to establish an intention that is not gathered from the operative words upon the face of the will.

Wills—Necessity for Operative Words.—A devise cannot be created without the use of operative words.

Annuities—Failure of the Fund.—Where annuities are payable from the rents of a building, and the building is sold during the course of administration, the rights of the annuitants are.measured by the rule that when the funds out of which annuities are payable fail, resort may be had to the general assets as in the case of a general legacy.

Alexander D. Keyes, for petitioners.   ·

Sullivan & Sullivan, and Theodore J. Roche, for respondent.

COFFEY, J.   Josephine C. H. Boyle, the daughter of the deceased, and one of the principal legatees and devisees in his will, and Anais Hale, his surviving wife, filed herein a petition for the final distribution of the above entitled estate.   It is claimed in the prayer of the petition, upon the facts therein set forth, that the entire estate should be distributed one-half to the daughter and the other half to the surviving wife.

To this petition an answer was filed on behalf of the respondent, Ann Feeney Wright, which, it was subsequently agreed, should stand as the answer for the other respondents, who appeared upon the hearing of the petition.   The application for final distribution presents two leading questions,

(1) the widow's contention that all of the property is community property, and that one-half thereof should be distributed to her; and (2) the daughter's contention that on a proper construction of the will and after a proper marshaling of the assets all of the residue of the estate should be distributed to her.

In the will of the decedent there is this clause: "I hereby declare and make known that all property owned and possessed by me at the date of this will and wherever situated is property or its income and revenue or property purchased by me with its income and revenue that I owned and possessed at the time of my marriage with my present wife—and is my separate estate."

This declaration has no legal force or effect; is not necessarily a statement of fact; it is merely at most the opinion of the testator; is not binding upon the widow; in short, is not to be considered to prove that the property was separate: Rowe v. Hibernia Savings etc. Soc., 134 Cal. 407, 66 Pac. 569.

Irrespective of this testamentary declaration and upon the evidence, in what way did the testator acquire the property of which he died seised? He married Anais Hale in 1880, and it is admitted that as he had previously acquired the Fresno property and the San Francisco tide lands, these items were separate estate.

On the part of the petitioner it is claimed that the remainder of the estate is community property, having been acquired subsequent to decedent's marriage with his surviving wife.

This property now on hand consists, first, of a six-tenths interest in the orchilla which formerly belonged to the Flores Hale Company, appraised at $3,283.35.

Second, the unsold portions of the Santa Clara ranch consisting of Lots A, B, and 1 of the Hale Ranch Subdivision, and unsold portions of the Margarita Tract, consisting of all the lots in that tract except lots 1 and 16, all of the Santa Clara county property being appraised at $15,984.95.

Third, the balance of the cash on hand, being a portion of the proceeds of the sale of the lots and of the supreme court building, as per supplemental account, $126,535.19.

The decedent and Anais Hale were married July 20, 1880.

The Santa Clara property which is still unsold was acquired June 12, 1886. The lot on which the supreme court building stands was purchased April 5, 1882, and the Flores Hale Company, from which the unsold orchilla was derived, was organized June 9, 1883.

It will be seen that the principal asset, about which there is contention, is the supreme court building or its proceeds.

The claim that all of this property having been acquired during coverture is presumptively community property is contested by respondents, who assert that they have overcome this presumption by showing that it was the proceeds of the rents, issues and profits of property owned by decedent prior to marriage. Respondents contend that from the facts proved it is clear that all of the estate of decedent was at the time of his death separate property, and an enormous amount of erudition is expended to establish this proposition. It is insisted that it is in proof that for years prior to the date of his marriage the decedent was in the exclusive possession of the same tract of land which was subsequently conveyed to the Flores Hale Company, claiming at all times to be its owner and holding himself out as such to the entire world.

But the evidence on this point is scarcely satisfactory. It does not appear to the court that he had a title to this extensive tract prior to marriage. He may have claimed to own the land and he had possession in a manner. He had men roaming and camping about gathering orchilla, but the only evidence of any title, exclusive of the partnership agreement and of the Pacheco grant, is in the statement of James Hale and Byrne that deceased was in possession under a claim of title previously conferred upon him by the government of Mexico, pursuant to contracts entered into between him and that republic. The tract was five million acres in extent. It is plain that such an immense area could not easily be covered by the campers employed by decedent. This claim of title, however, can hardly be sustained by the documentary evidence introduced. It certainly is not established by this species of evidence that decedent at the time of his marriage was the owner in fee of the entire tract of land upon

which the business in which he was engaged was carried on. A long and learned discussion is indulged in by respondents to overcome the effect of the Pacheco grant of 1883, but it is more interesting than convincing, and need not here be traversed. It is enough to say that decedent was the real party to this grant, James Hale being a mere agent, as is shown by the evidence.

The decedent went to Lower California some time before 1862. He hired gangs of men and sent them out through the country for the purpose of having them gather orchilla, which is a moss of natural growth reproduced without cultivation in two or three years. The men employed by the decedent were usually divided into camps and the number employed at one time reached as high as fifteen hundred to two thousand men. There were never more than two or three camps in actual operation. The camps moved from place to place after gathering the orchilla in question and sent it to Magdalena bay; there it was pressed into bales and shipped to Liverpool and the proceeds of the sales were remitted to the deceased.

The orchilla was never sold in Lower California, at the place of production, and the parties who had charge of the camps never knew anyone else in the occupancy of the land over which their operations extended, and understood the decedent to claim that he owned the land in question.

There is no direct evidence of the profits of this business, but there is direct evidence that the business was very extensive, and that the credits during the years 1876 to 1882 both inclusive, exceeded $1,000,000. At the close of the different years there were on hand the following balances:

| 1876 | $19,895.00 |
|------|------------|
| 1877 | 20,423.19 |
| 1878 | 7,542.09 |
| 1879 | 44,035.06 |
| 1880 | 6,194.94 |
| 1881 | 28,115.76 |
| 1882 | 58,316.00 |

There is nothing in the evidence to show that these balances were profit, and in point of fact the balances of each year

were carried into the accounts for the next year, so that there was no net balance for the entire period covered by the transcript put in evidence, which period ended January 31, 1883.

If the evidence had stopped here it is possible that the court might be justified in holding that the lands upon which the operations of the decedent were carried on, where the orchilla was picked and where no adverse occupants were found, belonged to the decedent; but the documentary evidence which the court has to consider, and which bears the admitted signature of the decedent, shows that only a small portion of these lands belonged to him.

On the eleventh day of June, 1880, the decedent entered into a copartnership agreement with Bartning Bros. and Gibert. Each of the partners furnished or brought in certain lands and personal property. The decedent's share of the partnership funds were inventoried at $43,295, and consisted of $14,000 worth of land "with title," of about $8,000 worth of land "adjudged and claimed"; total $22,000 worth of land and about $21,000, worth of personal property and improvements on land. Bartning Bros. furnished about the same amount of property, consisting of lands with full title, "lands in course of obtaining title," "lands rented," boats and other personal property. Felix Gibert brought in about $13,000 worth of property, consisting nearly entirely of lands with full title and lands "in course of adjudication." The partnership agreement was signed by J. P. Hale on June 11, 1880. The inventory was approved by the attorney in fact of Gibert on July 20, 1880. The partnership was to last for five years.

The agreement recited that by a previous agreement dated the 11th of March, 1880, J. P. Hale and Bartning Bros. had entered into an agreement with Felix Gibert at La Paz, Lower California, under the firm name of Hale & Company, for the purpose of operating at Magdalena bay, Lower California. That the partners had reached the conclusion that it would be better to dissolve this partnership and to form another special copartnership "directed solely by J. P. Hale and under his name: to realize said stock, gather, purchase and sell orchilla at Magdalena bay, Lower California, . . . . under the following conditions:

"First. The capital of the association is formed with the property specified in the inventory. . . . .

"Second. Mr. J. P. Hale will continue the trade and business at Magdalena bay as he has done up to the present time, using the capital as per inventory and the cash that may be necessary which shall be provided by him and by Messrs. Bartning Bros. Co. in equal shares.

"Third. Out of the net profits that may result . . . . Messrs. Bartning Bros. will receive forty-two per cent; Mr. Felix Gibert sixteen per cent, the remainder being for Mr. Hale.

"Fourth. Mr. Hale will give the contracting parties monthly a brief statement of the operations and accounts and a general balance statement every year.

"Fifth. During the existence of this partnership none of the contracting parties shall acquire for himself any orchilla lands in Lower California, nor grant any person whatsoever his interest therein.

"Sixth. The stock of Orchilla—at Magdalena Bay, will be shipped by Mr. Hale, to be sold for account of its respective owners.

"Seventh. Mr. Hale will endeavor to obtain advances in Europe on the most possible advantageous terms. . . . .

"Ninth. This agreement shall last five years.

"Nothing obtained in this agreement prevents Mr. Hale from applying himself to other business and enjoying individually and exclusively the products thereof, excepting the gathering, purchase or sale of orchilla."

"In case of the death of any of the contracting parties, their heirs or executors shall continue this agreement for one year. Should Mr. Hale die, then Messrs. Bartning Bros. will be the directors, but Santiago Hale will continue as administrator during the time the partnership shall exist."

There are two things that are plain from this agreement.

First, that Mr. Hale did not own the lands from which the orchilla was gathered.

Second, that he was not operating on his own account, but on the account of a copartnership which divided with him the profits of the venture.

The former of these points would require no corroboration, although James Hale himself testified that among the lands on which the orchilla operations were carried on were the following: San Carlos, Bajos de Sta Domingo, San Juanico, Ojo de Liebre, San Juan, San Francisco, Medano de las Jiquimas, Santa Rosa, Salinas, Mesquital, San Pedro and San Pablo. All of these lands were brought into the co-partnership by Bartning Bros. & Co.

Independently of the evidence on the subject of lands and business in Lower California, the only evidence of any property owned by the decedent at the time of his marriage consists of the evidence that he owned the following real estate: First, the Oak street property, which was improved with a cottage; second, the lot on Market street, near City Hall avenue; third, the partnership lands; fourth, the San Francisco tide lands. There was no evidence as to the value of any of these lands or as to the income if any which they produced.

In regard to the cash on hand at the time of the marriage, the only evidence before the court consists first of the bank book of the Donohoe-Kelly Banking Company. This book was not balanced at the time of the marriage and therefore does not show that the decedent had at that time any balance whatsoever. It was balanced, however, some time between April 29 and June 11, 1880, and shows no balance on hand. The next balance was struck August 3, 1880, when the decedent had on hand $496.65. Between these two periods he deposited $11,162 and drew out $10,665.15. As above stated, there is no evidence that in the Donohoe-Kelly Bank at the time of the decedent's marriage there was any cash to his credit.

So far as the orchilla business account is concerned it showed on July 20, 1880, a credit balance of $12,594.18. The only other evidence which is material on this subject is that the decedent as early as 1876 and as late as 1886 was continuously borrowing money on promissory notes from the Donohoe-Kelly Bank.

It also appears from the testimony of James Hale that the contract between James Hale and General Pacheco, acting on behalf of the Mexican government, was made by James Hale solely for the benefit of his brother Joseph P. Hale.

The terms of this contract are material for the purpose of showing that the decedent was not solely engaged in the business of gathering, shipping and selling orchilla.

The contract between General Pacheco, acting for the Mexican government, and J. Conrado Flores, for himself and on behalf of James C. Hale & Co., was made March 31, 1883, and provided as follows:

The Flores Hale & Co. (Flores and James C. Hale, who was acting for Joseph P. Hale) were authorized to "effectuate the measurement and demarcation of the public lands existing in the territory of Lower California between the parallel of 23½ and 29 degrees latitude north in a zone of six leagues width counted from the mark of the full tide toward the interior. . . . . In consideration of the expenses caused by the aforesaid acts Flores Hale & Co. shall receive as their property one-third of such lands as they may survey.

"The government conveys to Flores, Hale & Company the remaining two-thirds of the lands they may survey to be exclusively applied to colonization purposes at the price fixed by the tariff."

The Pacheco contract, therefore, was a contract by which the government agreed to convey lands in consideration that the grantees would survey certain public lands and colonize others. In a certain sense the business undertaken by the Flores Hale & Company (in which the decedent was of course interested) might be termed a part of the orchilla business, because doubtless the lands in question were lands which produced orchilla, but in a strict sense the business in question was the business of surveying and colonizing lands for hire, and the profits of any such venture should certainly not be classed with the rents and profits received from the ordinary use and occupation of land.

To sum up, therefore, the evidence shows the following state of facts:

First. The decedent was not exclusively engaged in the business of picking and selling orchilla.

Second. The orchilla which he did pick did not come from his own land, but partly from land that belonged to him and partly from the land that belonged to his partners.

Third. The orchilla which was picked was not sold on the land in the usual manner in which the products of land are sold, but was shipped a distance, say, of twelve thousand miles, and the money was remitted back to another point approximately five thousand five hundred miles from the place of sale and over one thousand miles from the place of production.

The authorities which declare that property purchased with the rents, issues and profits of land which is the separate property of the husband becomes likewise his separate property, restrict the rule to cases in which the purchase money is the proceeds of the land used in the ordinary manner, but no case has gone so far as to hold that the products of land when shipped to a distant country and used in a business venture shall be treated as the ''rents, issues and profits'' of land.

Fourth. The funds were not traced from the alleged separate property of the decedent into the alleged investments.

Fifth. The land which was alleged to be the separate property of the decedent was situated in the Republic of Mexico and was subject to its laws. The rents, issues and profits of land are in effect the land. Hence the rents, issues and profits of this Mexican land were subject to its laws, and by those laws they were community property.

Article 14 of the Civil Code of the federal district, territory of Lower California, provides, ''As to real estate situated in this state it shall be subject to the Mexican law even if it belongs to foreigners.''

Article 2141 provides as follows: ''The following is community property: Subd. 7. Fruits, accessions, rents, and interests received or due during coverture arising from the community or separate property of either consort.''

The law of the situs of real estate governs real property. This is elementary; and it has always been held that lands purchased in a community property state with funds derived from real property acquired in a common-law state became the separate property of the husband, even if the funds were acquired in the other state in circumstances which would have made the land from which it was derived community property of the spouses: Estate of Burroughs, 136 Cal. 116, 68 Pac.

488 (per Temple, J.); Tanner v. Robert, 5 Mart. (La.), N. S., 255; Nott v. Nott, 111 La. Ann. 1029, 36 South. 109; Clark v. Thayer (Tex.), 71 S. W. 1050.

These cases present the converse of the case at bar. There the money which bought the land in Louisiana and Texas would have been community property if the entire transaction had taken place in Louisiana and Texas, but as it came into Louisiana and Texas as separate property, the investments made with it were held to be of the same character as the money was in the foreign state.

It having been determined that one-half of the cash on hand, one-half of the unsold orchilla and one-half of the Santa Clara county lands must go to the widow as her share of the community property, the next question that presents itself is, To whom shall the residue be distributed?

This residue consists of one-half of the orchilla....$ 1,641.67
One-half of the Santa Clara county lands.......  7,997.47
One-half of the cash on hand...................  63,267.60
The Fresno land, worth.........................  1,000.00
The San Francisco tide lands, worth............    402.00

Total estate after community interest of widow is
     taken ......... ............... .............$74,308.74

From the foregoing it will be seen that the court has adopted the view of the petitioners and discarded the deduction of the respondents that the entire estate left by the decedent, under the law and the facts, constituted his separate property and estate.

Petitioners in their reply brief advert to the fact that there are two considerations of considerable importance which are not referred to in the respondents' brief: First, the evidence shows that after the marriage of the decedent to Anais Hale, and for a long period of time, he was constantly borrowing large sums of money without security from the Donohoe-Kelly Banking Company. Money borrowed on the personal security of a married man not being "property owned . . . . before marriage," and not being "property acquired by gift, devise, bequest or descent," nor the rents, issues or profits of either, is community property: Civ. Code, 163, 164.

Money borrowed by a married man and not secured by his separate property is community property: Perry v. Ross, 104 Cal. 15, 43 Am. St. Rep. 66, 37 Pac. 757; Althof v. Conheim, 38 Cal. 230, 99 Am. Dec. 363; Schuyler v. Broughton, 70 Cal. 282, 11 Pac. 719. The evidence, therefore, shows that large sums of money came to the decedent from sources other than his orchilla business. There is nothing to negative a presumption that these sums might have purchased some of the property in question. Secondly, respondents' argument to the effect that all of the land covered by the Pacheco grant belonged to him before he was married is negatived by the exhibit entitled, "List of Deeds of Lands in Lower California in Box Marked J. P. Hale, Spanish Deeds." This exhibit .is entirely in the handwriting of the decedent, and gives a list of a large number of grants, contracts and other papers, giving in each instance the date of the grant and the number of hectaras covered by the grant. The two main grants were made in 1884. There were several made in 1877 and 1878, and a great many made in the early part of 1882. It is a fair presumption that this list gives a brief history of the titles to the land which passed to the Flores Hale & Company, and shows that some of these lands were acquired before marriage, and by far the greater number were acquired long afterward.

The next point is as to the construction of the will. The question as stated by respondent is: Did the deceased, in his will, make a valid devise of the remaining one-half of the Supreme Court property to Margaret Ryan and certain of his other brothers and sisters named near the end of paragraph 1 of his will, contingent upon failure of issue in his daughter? In other words, did not the deceased devise to his daughter, in fee simple, but one-half of the land, and qualify the remaining one-half by making an unqualified or fee simple title in her, dependent upon the fact that she die leaving issue?

The position assumed by respondent is that the will clearly indicates that it was the intention of the testator, when he made his will, that his daughter, Josephine, should only have a fee simple title to one-half of the property upon the death of his wife, and that as to the remaining one-half, her title

should be qualified by having issue; and that upon failure of such issue, this one-half should, by virtue of the will of the deceased itself, vest in, and was by him devised to, the brothers and sisters above referred to.

The decision of the court, so far as it relates to this question, must depend upon the interpretation which it shall place upon the will.

Respondent claims that the language of the will is clear, direct and unambiguous, creating a remainder in the undivided half of the Supreme Court building in favor of certain relatives; and sections of the Civil Code and many pages of extracts from decisions are quoted to support this thesis.

The words of the will which are claimed to create this remainder are the following: "My said daughter Josephine to own and hold said house or building and the land upon which it is situated . . . . without the power to sell or mortgage the same during her natural life, but with power to dispose of the same as she may desire by her last will in case she has any issue then living. But in the event of her having no issue at the time of her death as aforesaid, then she shall only will one-half of the said building and lot, leaving the other one-half to be divided between my sisters, my relative, and my aunt."

Respondent asks, What was the intention of the deceased concerning this property? And answer that it was, first, that his daughter, Josephine, should have one-half of the net rents of the Supreme Court building, during the life of his wife, and until the annuities to be paid out of the other half had been fully satisfied; second, that if his daughter, Josephine, had issue living at the time of her death, she was to have the entire property, with the right to will it to whomsoever she desired, which under the law of this state, would be a title in fee simple; third, if, however, his daughter failed to have issue, then that the persons referred to, being some of his brothers and sisters, and an aunt, or her daughter, should have the remaining one-half of her property.

In the paragraph from which the quotation is made testator created the annuities, and made them a charge upon that half of the rents and profits not given to his daughter.

Respondents call attention to the fact that all of the language used by the deceased by which he attempts to effect a devise of the property is contained in but one paragraph, and remark that there is no separation whatever between any part of the language, except in the punctuation of sentences.

Therefore, they say, the court, in determining the intention of the testator, has to deal with but one continuous paragraph of this will, and it must also be borne in mind that the will, which is to be construed by the court, was not compiled by a man learned in the law or even by one who had a very large vocabulary, or had the power of choosing apt words and phrases to express his ideas and intentions. It was written by the deceased himself, who, though evidently having had a varied, as well as extensive, experience in business matters, did not possess any great amount of literary attainment. It may be true that if he had consulted a lawyer in the execution of this instrument, the language used in expressing his intention would have been different from that in which it is couched. But as the decisions hold, it makes no difference what language is used by the deceased in his will, if his intention can be determined, it will be sacredly enforced.

It must be ascertained, however, from the words of the will itself. It is a familiar phrase formulated by our supreme court that it is not what the testator meant, but what his words mean. The intention to be sought for is not that which may have existed in his mind, but that which is expressed in the language of the instrument itself.

It is claimed by respondents that the words in the last paragraph of the clause quoted do not admit the construction placed upon them by petitioner, who says that by them testator does not give any interest in the land to the relatives indicated, but directs the daughter to leave it to be divided among them, and respondent asserts that it is not absolutely impossible to so construe the will without violating its letter and spirit.

Upon this point respondents construct an elaborate argument to show that the word "leave" or "leaving" cannot be construed to mean that the property should pass by the laws of succession, for the use of this word in instruments has been held by courts to impress upon them the character of wills.

In the case of Doe v. Thorley, 10 East, 438, the deceased bequeathed to his wife "all his personal estate during her natural life and also at her disposal afterward to leave it to whomsoever she pleased." In holding that this merely gave her the right to will it, and not deed it, Lord Ellenborough, C. J., used the following language: "In common understanding the word 'leave' must be taken to apply to that sense of it in which a person making his will would naturally use it, namely, by a testamentary disposition. But I found my opinion on the word 'leave,' which shows that the testator meant the power to be executed by the will."

Mr. Justice Bailey, in a concurring opinion said: "The word 'leave' as applied to the subject matter prima facie means a disposition by will." To the same effect, see Allen v. McFarland, 150 Ill. 455, 37 N. E. 1006; McKonkey's Appeal, 13 Pa. 253; Mitchell v. Donohoe, 100 Cal. 202, 38 Am. St. Rep. 279, 34 Pac. 614.

In the case under discussion, respondents contend that it cannot be construed to mean that the deceased intended his daughter to will it to his relatives, because, as has already been stated, in positive and direct language, he deprived her of that power. In some of the cases cited by respondents, it was held to be necessary for the court to transpose words, in order to arrive at the intention of the testator. In others it was held necessary to supply the omission of words not contained in the will, and in other cases, some of which are not cited, it was thought necessary for the court to take testimony showing the circumstances surrounding the execution of the will; but in this case it is unnecessary to do any of these things, according to the argument of respondents, who insist that the intention of the deceased to devise to certain of his relatives a remainder in one-half of the Supreme Court property, contingent upon the failure of issue in Josephine, is as transparent as though it were expressed in words selected and phrased by the most eminent lawyer practicing at our bar. It matters not in what language this intention is indicated. If it can be gathered from the language used, and the intention is one which is lawful and not prohibited by our law, then it must be enforced, however unjust it might appear to the court.

In order to present as shortly as possible the matter of difference between the counsel, the position of petitioner is that the clause does not impose a limitation, but is simply a direction to the daughter not to will the land, but to leave it to the persons in question. In other words, the testator does not himself give any interest in the land to the relatives, but directs the daughter to leave it to be divided among them.

This is not a limitation of an estate. The meaning of a limitation is practically defined to be a qualification of an estate given. To the same effect are the authorities. It will suffice to quote Williams on Real Property, pages 210-211, who says that ''words of limitation are words which mark out the estate to be taken by the grantee.''

There are no words in this will which limit or mark out the estate to be given to Josephine C. H. Boyle. The most that can be said is that the clause which prohibits her from disposing of the estate by will and which directs her to leave it to be divided between the six relatives creates a clear interference that the testator meant that they should have the estate in the event that the daughter would die without leaving issue. But this is not enough; for it is provided in section 1322, Civil Code, that ''a clear and distinct devise or bequest cannot be affected . . . . by any other words not equally clear and distinct, or by inference or argument from other parts of the will.'' This rule is but a codification of the rule of the common law.

In Boyle v. Boyle, 152 Pa. 115, 34 Am. St. Rep. 629, 25 Atl. 494, the court said: ''We held that words of command addressed by the devisor to the devisee are as ineffectual to reduce a fee to an estate for life as precatory or explanatory words. Mere precatory words or words of command or words of explanation are not enough to establish an intention that is not to be gathered from a consideration of the operative words upon the face of the instrument.''

The case of Sprankle v. Commonwealth, 2 Walk. (Pa.) 420, is a case which, in the opinion of petitioner, is remarkably like the case at bar. The words of the will which created an interest in the testator's nephew, Peter Sprankle, were the following: ''I give and bequeath to my nephew, Peter Sprankle, all of my messuages, lands and tenements whatsoever. I

hereby also say that Peter Sprankle is not to sell nor can it be sold or disposed of for the debts of said Peter Sprankle during his lifetime, and after his death if he leaves no heirs, the aforesaid lands, messuages, and tenements to be willed by him to some Sprankle name, or if no will be made by him the said Peter Sprankle the said lands to revert to some of the Sprankle family.'' It was held that Peter took an estate in fee simple.

It was therefore apparent petitioner maintains that, subject to a life estate given to the widow and subject to the annuities, all the testator's right, title and interest in the Supreme Court building passed to his daughter Josephine. The interest that was given was clearly a fee simple interest in one-half of the building and a fee simple interest in the remainder after the death of the wife.

The only words which can create any interest in the sisters, the relative and the aunt are the words ''leaving the other one-half to be divided between my sisters, my relative and my aunt.'' These words clearly show that Josephine Boyle shall will only one-half of the lot of land and Josephine Boyle shall leave the other half to be divided.

The meaning of the will is plain in this respect. The testator directed Josephine Boyle to leave the one-half to be divided, and the petitioners assert that ''devise cannot be created by directing another devisee to leave a portion of the property to third parties.'' In other words, a devise cannot be created without the use of what the supreme court of California calls ''operative words.''

This principle is established in the two cases of Estate of Fair, 132 Cal. 530, 84 Am. St. Rep. 70, 60 Pac. 442, 64 Pac. 1000, and Estate of Young, 123 Cal. 337, 55 Pac. 1011.

In the Estate of Fair there was an unmistakable intent on the death of the children of the decedent the grandchildren should obtain an interest in the property, and if the children died without issue, that certain other persons should acquire an interest in the land. It was just as plain that Fair meant his grandchildren to have an interest in his estate as it is in the case at bar that Joseph P. Hale intended his sisters, his relative and his aunt to have an interest in the Supreme Court building. Nevertheless, the supreme court held that

because there were no operative words to create this interest, the grandchildren of the decedent were entitled to nothing, and the court used this language (132 Cal. 530):

"Appellants indulge in frequent invocations of the rule that the intention of the testator must prevail, and they seek here to apply the rule to the point that this will should be construed as if it directly devised estates in remainder to the classes named. . . . . But the rule includes the propositions that the intention must be found in the will itself; that where the language of the instrument is unambiguous and clear, there is no field for the play of construction; that where the testator has clearly expressed one intention, the court cannot impute to him another. . . . . And 132 Cal. 531: The principle that the intention which the testator has clearly expressed in his will must be followed, and that . . . . the will cannot be construed as intending a direct devise where the clearly expressed intention is otherwise, and that there cannot be a devise without operative words sufficient to create it is aptly illustrated in the Estate of Young, 123 Cal. 337, 55 Pac. 1011.''

In the Estate of Young the intention of the testatrix was equally clear: "To C. H. Young, my husband, my bank book shall be handet to him with gold watch and chain also two deeds. After my husband deatts the two deeds shall go to Katarina Muhr.''

It was obvious that when the testator said the two deeds shall go to the husband and after his death to Katarina Muhr, she meant that the husband should have the land for life with the remainder in fee to Katarina Muhr, but the court, in rejecting this construction, said: "There was no delivery of these deeds during the testatrix's life. What validity they possessed then comes from the will, and, therefore, if by act of the testatrix title to these lands passed, we must find in the will both an intent to devise them and operative words to effect the intent. . . . . 123 Cal. 344: If the legal effect of his expressed intent is intestacy, it will be presumed that he designed the result.

"The inquiry will not go to the secret workings of the mind of the testator. It is not what did he mean, but it is, what do his words mean?''

In the case at bar the words of the testator mean that Josephine Boyle should leave the property to be divided between the six persons in question. There are no operative words which create a direct devise, and therefore it is void.

Even if there were a case of intestacy, this result would follow; but it is contended that the case is still stronger in this instance of a previous and a subsequent devise.

The previous devise is as follows: "I give and bequeath to my daughter Josephine one-half of the net rent and profits of my building known as the Supreme Court Building. . . . . Also all the above described lands, with the building, after the death of my present wife. My said daughter Josephine to own and hold said house or building and the land on which it is situated. . . . ."

The subsequent devise is in these words: "Tenth: I hereby authorize and empower my executors to sell and convey all and any of my property, real and personal, except the property on the corner of Larkin and McAllister known as the Supreme Court Building, which is devised to my daughter as set forth in this will."

The devise to the daughter is plain. The alleged devise to the sisters, the relative and the aunt at most is an inference. Section 1322, Civil Code, therefore applies: "A clear and distinct devise or bequest cannot be affected by . . . . other words not equally clear and distinct, or by inferences, or argument from other parts of the will."

Petitioner asserts that in the case at bar the testator did not give the land to another upon the death of Josephine Boyle without issue. The most that the testator did was to declare that if Josephine Boyle should die without issue she should leave it to such other persons. The rule, therefore, which applies is the rule set down in Boyle v. Boyle, 152 Pa. 115, 34 Am. St. Rep. 629, 25 Atl. 494.

The respondents claim that the testator could not have meant that Josephine Boyle was to leave the property to the sisters, the relative and the aunt, because she could only leave it by two methods, one by intestacy, and the other by will. He could not have intended intestacy, it is said, because intestacy would not have brought about the result in question,

the sisters, the aunt and the relative not being the heirs at law of Josephine Boyle; but it is said he could not have intended that Josephine Boyle was to will the property because he had previously said that she should not will it. Whatever the testator may have meant, he certainly did say that Josephine Boyle was to leave the property to the persons in question. Whether he meant by intestacy or by testament we need not inquire; but there is strong reason for believing that he meant his daughter to leave the property by her will to the persons in question. It is true he says she shall not will it, but a later clause of his will shows that this prohibition against willing referred to an unfettered power to will, for he says (third paragraph) : "Should my daughter die without issue the one-half the property . . . . which she has a power to will one-half of, it shall go to the charitable institutions in this city or state as she may select, and the other half to whom she wishes, making one-fourth of the property left to her discretion to will to whom she pleases provided she dies without issue."

Now, the testator says in this paragraph that there is only one-fourth of the property left to her discretion to will to whom she pleases, which tends to show that the other three-fourths were intended to be willed by his daughter in the manner in which he had directed. But whatever he may have meant he certainly said that his daughter was to leave one-half of the Supreme Court building to the sisters, the relative and the aunt, and the word "leave," as the respondents say, quoting the case of Doe v. Thorley, 10 East, 438, "as applied to the subject matter prima facie means a disposition by will." If he did not mean a disposition by will he may have supposed that he could constitute the sisters, the relative and the aunt the heirs at law of his daughter. But whatever he may have meant he certainly said that whatever right, title or interest should come to them should pass to them by being left to them not by him, but by his daughter.

I have gone over carefully the briefs of counsel and have endeavored to present their points of variance on the main questions, and had intended to proceed further in an attempt to state the grounds of decision, but so much time has

elapsed that it is expedient the case should be decided without further delay, and I must content myself now with saying that on the issues hereinabove discussed I am of the opinion that the law as declared in California is correctly set forth by the counsel for petitioner.

With respect to the annuities, while the counsel for petitioner says it is a matter of simple solution, this court has been very reluctant to accept his conclusion, but after serious consideration it seems to be sound as he states it.

The property out of which the annuities are payable consists of the rents of the Supreme Court building. The rents of the Supreme Court building have certainly failed, and will never again come into the hands of the distributees of this estate. The money on hand was not derived from the rents of that building, but was derived from the proceeds of its sale. Therefore, the particular property which the testator designated as the fund from which the annuities were payable has, in fact, failed. The rights of the annuitants are, therefore, measured by subdivision 3 of section 1357 of the Code of Civil Procedure: "If the funds or property out of which they (the annuities) are payable fails, resort may be had to the general assets as in the case of a general legacy."

It is true that the money on hand is, to a certain extent, treated for the purposes of distribution as the Supreme Court building would have been treated if it had not been sold. But the reason why the funds are so treated is not that the funds and the building are identical, but the devisees of the Supreme Court building, being preferred devisees, are subrogated to the rights of those to whom the funds on hand would otherwise belong. For that reason only the fund must be distributed to the devisees of the Supreme Court building as their interests shall appear, and with such contributions and allowance between themselves as the several preferences shall require.

For years during the progress of this administration the court sought to save the Supreme Court building from sacrifice, for the sake of the annuitants, and to execute the intention of the testator, but at last it had to be sold, and although the court regrets that this result had to be reached, it seems to have been an unavoidable consequence of circumstances.

Finally, the theory of the law governing this case as advanced by petitioner is accepted by the court and the prayer of the petition is granted.

---

The Presumption that Property Purchased During Marriage is Community Property is very cogent, and can be repelled only by clear and conclusive proof; but where it is established clearly and conclusively that the property was purchased with the separate money of one of the parties, it remains the separate property of the party with whose money it was purchased: Love v. Robertson, 7 Tex. 6, 56 Am. Dec. 41. See, also, People v. Swalm, 80 Cal. 46, 13 Am. St. Rep. 96; Svetinich v. Sheean, 124 Cal. 216, 71 Am. St. Rep. 50; Crochet v. McCamant, 116 La. 1, 114 Am. St. Rep. 538. Where property is purchased partly with the separate funds of a wife and partly with community funds, it belongs to the separate and community property in the proportion in which the moneys came from each: Heintz v Brown, 46 Wash. 387, 123 Am. St. Rep. 937, 90 Pac. 211.

Personal Property Acquired by Either Husband or Wife in a Foreign Jurisdiction which is by the law of the place where acquired the separate property of either, continues to be such property when brought within this state, and if invested in or exchanged for real property, such property becomes separate estate also: Brookman v. Durkee, 46 Wash. 578, 123 Am. St. Rep. 944, 90 Pac. 914. And if money acquired by a married woman in one state as a member of a partnership there becomes her separate property, and is brought into another state and deposited as the funds of such partnership her share thereof remains her separate property, and real estate there purchased by her and paid for by a check of such partnership, in a sum less than her share of such deposit, is not subject to her husband's separate debt: Elliott v. Hawley, 34 Wash. 585, 101 Am. St. Rep. 1016, 76 Pac. 93.